ELIZABETH HEGMAN, ADMINISTRATRIX OF HUGO HEG-
MAN, DECEASED, PLAINTIFF, DEFENDANT IN ERROR,
v. THE JERSEY CITY, HOBOKEN AND PATERSON
STREET RAILWAY COMPANY, DEFENDANT, PLAINT-
IFF IN ERROR.

Argued June 2, 1908—Decided February 23, 1909.

1. A trolley car on a dark night was, by reason of the trolley pole
   leaving the wire, left standing unlighted, and while so standing
   another car, running in the same direction, on the same track,
   collided with it, and by force of the impact the front platform of
   the rear car was crushed, and the motorman standing upon it was
   killed. The testimony was such that the jury could draw the
   conclusion that the crushed platform was old and rotten, and had
   been imperfectly inspected. In an action by the administratrix
   of the deceased—*Held*, that the trolley company was responsible
   for the death of the motorman, if caused by the negligence of the
   company in failing to take reasonable care to maintain the plat-
   form in a safe condition.
2. The trial judge was asked to charge that the proximate cause of
   the injury to the deceased was not the giving way of the platform,
   but was the running of the rear car into the front car. The court
   refused to so charge, but charged that if the platform was not
   defective at all, or, if defective, did not bring about or contribute
   to bring about the death of the deceased, the jury should find for
   the defendant.
3. There was no error in the charge or refusal to charge.

On error to Hudson County Circuit Court.

Before Justices REED, BERGEN and VOORHEES.

For the plaintiff, defendant in error, *Alexander Simpson*.

For the defendant, plaintiff in error, *Edwards & Smith*.

The opinion of the court was delivered by

REED, J.   This action was brought by the administratrix of
Hugo Hegman, who was killed in a collision between two cars
of the defendant on April 15th, 1907. The deceased was a
motorman on the car which ran into another car which had

been running ahead of the car of the deceased, and which had, at the time of the collision, stopped and was standing upon the track on which the car of the deceased was following.

The charge in the declaration is that the deceased was operating his car at night, in the darkness, and that upon the same track, down a steep descent, at a point upon defendant's line of track which was unusually dark, and so maintained by the defendant by its servants—a car stopped in the darkness because there was no light along the track or upon the said car; that the car of the deceased was equipped with defective brakes, and a rotten and decayed front platform, caused by a lack of reasonable care on the part of the defendant to furnish the deceased with a safe place on which to work; and because of these conditions, the deceased ran into the car in front of him, and his platform was smashed, and the deceased was killed.

The evidence on the part of the plaintiff was that the forward car was at a fast rate of speed going down an incline at Fourteenth street, Hoboken, in which there were two or three curves, when the trolley pole came off and left the car standing in darkness.

A witness, Mr. Paul, says that he was a passenger upon the forward car and that somebody told him to jump, and he jumped; that before he jumped he saw a car all lighted up coming toward the car he was on; that this following car hit his car, bounced back a little, then went ahead again and struck his car a second time, when the front platform of the rear car, upon which the deceased was standing, caved in, the vestibule went down underneath the car, and the deceased went down with it. Mr. Paul says he first saw the rear car coming around the corner three car lengths away, and the motorman was working his brake.

Mr. Leonard, another witness, says he was on the front car and it was running at the rate of forty miles an hour, so fast that he went inside; and that they had got down two hundred feet from the top of the hill when the trolley pole went off. He says the car stood a minute, or a minute and a half, and he says it was a minute between the time when he first saw the rear car and the moment when it struck.

Mr. Middleton, another witness, says he saw the rear car at the horseshoe, three or four hundred feet away.

From the testimony the distance from the standing car to the point where the rear car came in sight, is not very clear; but it seems to have been somewhere between two and four hundred feet. Nor does it appear how closely the rear car had been following the front car before the latter stopped, nor how long the front car was at rest before the collision. Nor does it appear whether the headlight on the rear car was lighted, nor how far in front of a car another car would be visible, or within what space a car running at a reasonable rate of speed at that point could be stopped by the use of a hand brake such as that with which the rear car was equipped. That the motorman of the rear car was using his brake when first seen, was testified to, as already observed.

It seems therefore impossible to attribute negligence to the deceased. It follows therefore that the collision was either a pure accident, without the fault of anyone, or that it resulted from the fault of the defendant in maintaining a defective front platform upon the rear car.

The testimony concerning the condition of the platform is the following: One Morris went to the scene of the accident soon after its occurrence. He says he found the front platform of the rear car slammed against the front car, and that the bottom part of the vestibule was in pieces and the buffer all broken. He says: "You could not get hold of the wood; it would crumble in your hand. When you took hold of the wood it would break apart and crumble in your hand. It was just rotten wood."

Mr. McCartney, a policeman, arrived at the place of the accident soon after it happened, and says he looked at the wood that had been the front platform or buffer of the rear car, and it seemed to be wood not in very good condition, according to his estimate.

Mr. Rule was also there, and says the front platform of the rear car was rotten. He says he took the wood in his hand and it felt like sand, all rotten; and that they put a jack underneath and the jack went into the wood; and they moved

the jack back and the jack sank into the wood because it was rotten.

It appears that this car had been in use upon the road at least four years before the accident, but how much longer is not shown; but that it was among the older cars appears from the fact that the newer cars were equipped with air brakes, and this car was equipped with a hand brake.

It also appears that although Mr. Strong, the inspector for the defendant, says that he inspected cars every two or three days to find out any defects in the way of broken glass or weak points in the floors or doors, he admits that the last time he inspected this car was on March 4th, when he inspected the floor and wood work. The accident, as already observed, happened on April 15th following.

Whether the inspection he made every two or three days included the platforms, is not clear; but he says that he had not inspected this car at all for nearly a month and a half before the accident.

From this testimony, it was obviously a question for the jury whether the defendant exercised reasonable care to maintain a reasonably safe platform to support the motorman, and for the jury to say whether if the platform had been maintained in a reasonably sound and strong condition, it would have resisted the shock of the collision and so preserved the life of the deceased.

It is argued that the platform of a trolley car is not intended to be used for the same purposes as platforms of steam railway cars, which are liable to be jammed against each other in stopping, starting and operating the cars, and that therefore the same strength and solidity in construction is not requisite.

It is apparent, however, from the very form of its construction that the bumper and platform is designed to withstand the shock of a possible collision. The purposes to be attained by this method of construction are doubtless several, among which is the design to save the body of the car from injury, and so avoid the expenses of reparation, as also to preserve the safety of the company's passengers. But whatever the purposes of construction, the necessity for it arises from

the recognized danger of a collision; and it is manifest that in case of a collision, the servant whose place is upon the platform is the first person likely to be imperiled.

In view of the habitual forms of construction of these platforms, I think that when a motorman takes service with a trolley company, he has the right to assume that the platform upon which he is to stand is constructed and maintained in as sound and strong a condition as similar structures are usually built and kept. Of course if, from his own observation, or other information, he knows to the contrary, he takes the risk of danger from a defective platform; but if he has no knowledge of a defect, and the imperfection arises from a want of reasonable care on the part of the company, the responsibility will rest upon the company for injuries resulting to the servant therefrom.

Again, the court was asked to charge that the proximate cause of the injury to the plaintiff was not the giving away of the platform, but the running of the rear car into the front car. The judge refused to charge this as a proposition of law, but left the question to the jury, charging that if the jury found either that the platform was not defective at all, or that there was a defect in the platform which did not bring about or contribute to bring about the death of the deceased, then the jury should find for the defendant.

Of course, if the condition of the platform contributed to the death of the deceased, then the speed of the rear car was not the sole cause, but only a concurrent cause of the accident. The request to charge that the running of the rear car into the front car was the proximate cause, could mean only that it was the sole cause; and the court could not say as a matter of law that having found the platform defective, it was not a concurrent cause.

The judgment should be affirmed.